### WHITESIDE v. THE PEOPLE *ex relatione* UPHAM.

Where the *removal* of a public officer is, by statute, given to *two distinct bodies,* and a request to assemble in joint meeting, is made by one body to the other, and the two bodies do assemble in *joint meeting,* though not for the purpose of making the removal, but for the transaction of other business, and whilst in *joint meeting* it be agreed by a majority of voices to proceed to the removal of the officer, and a ballot be taken, removing him, *such removal is valid,* although *all* the members of *one of the bodies* refuse to act in the matter, leave the *joint meeting,* and are not present during the balloting, provided that a majority of the whole number of both bodies concur in the removal.

So where the *appointment to office* is given to two *distinct bodies,* and the mode of appointment is directed to be after this manner: each body to meet in its own chamber and make a nomination, both bodies then to assemble in *joint meeting* and compare nominations; if the nominations agree, the person nominated to be considered as appointed; but if there be no concurrence, then the two bodies to proceed to *elect* by *joint ballot* from the persons nominated; and an invitation be given by one body to the other, to assemble in *joint meeting* for the purpose of making a particular appointment, and the two bodies assemble in joint meeting, not for the purpose of making the proposed appointment, but for the transaction of *other* business, and when thus assembled, it be agreed by a majority of voices to proceed to the contemplated appointment, and the announcement of a nomination by one of the bodies be made, and it be declared that the other has made no nomination and refuses to act in the matter, the appointment of the officer by a majority of the whole number of both bodies, *is a valid appointment,* although *all* the members of the body which had omitted to make a nomination, leave the *joint meeting* and take no part in the appointment.

The decision in 23 *Wendell* 9, is accordingly over-ruled.

ERROR from the Supreme Court. The attorney-general on the relation of *Ebenezer P. Upham,* on the *second* day of *January,* 1839, filed an information in the nature of a *quo warranto,* charging *Robertson Whiteside* with having on the *sixth* day of *December,* 1838, intruded

into the office of *treasurer of the county of Chautauque,* without lawful authority; and with having since that time held the same, claiming to be such treasurer, and to have use and enjoy the liberties, privileges, franchises and emoluments appertaining to the office. The attorney-general also alleged, that *Ebenezer P . Upham,* the relator, was and during all the time alleged in the information, had been rightfully entitled to the office into which Whiteside had intruded, averred Upham's right thereto, and prayed judgment of the court upon his right, and the right of *Whiteside.* The defendant *pleaded,* that at a meeting of the judges of the court of common pleas and board of supervisors of the county of Chautauque, held on the 14th November, 1838, the office of treasurer of the county having become vacant by the *removal* of the relator the former treasurer of the county, he, the defendant was duly appointed treasurer; and that he gave the necessary bond with sureties, and was duly admitted into the office; by virtue of which premises, he uses and exercises the office and enjoys all the privileges appertaining thereto, as it is lawful for him to do—traversing the usurpation. The attorney-general *replied,* denying the *removal* of the relator, and the appointment of the defendant as alleged in the plea.

The issue thus joined was tried at the Chautauque circuit in July, 1839, before the Hon. NATHAN DAYTON, one of the circuit judges, and a *special verdict* found by the jury. The facts in reference to the *removal* of Upham, and the *appointment* of Whiteside, as found by the jury, are briefly as follows: On 13th November, 1838, the first day of the *annual meeting* of the supervisors, a resolution was adopted, requesting the judges of the county courts to meet the board of supervisors, and form a *joint meeting,* for the purpose of taking into consideration the propriety of removing the county treasurer, at five o'clock of the evening of that day. A copy of the resolution was served upon each of the judges, then at Mayville, (the place of

*1841.*

Whiteside
*v.*
The People.

meeting of the supervisors,) between two and four o'clock P. M. The judges did not attend at the appointed time. On the same day notices were reciprocally given by the judges and supervisors to assemble in *joint meeting* at nine o'clock the next morning, *for the purpose of comparing nominations.* At nine o'clock the next morning, the judges repaired to the room of the supervisors, who were then in session, and declared themselves in readiness to *compare nominations.* A joint meeting was thereupon organized by the choice of a chairman, and immediately thereafter a motion was made by one of the supervisors *to proceed to the removal of E. P. Upham from the office of county treasurer,* which was immediately adopted. As soon as the motion was made, the judges rose to leave the room, and whilst going out, the *first judge* remarked that they did not come for that purpose. The chairman called for the ballots, which were handed in, and on counting them, it appeared that there were *nineteen* ballots for the removal, *three* against it, and *one* not against it. Whereupon the chairman declared *Upham* to be duly removed from the office of county treasurer. The judges did not vote, nor were they present when the ballots were taken. Shortly afterwards the judges returned to the supervisors' room to *compare nominations for commissioners of deeds* and *superintendents of the poor.* Whilst engaged in doing so, the clerk of the supervisors read a paper to the judges, the purport of which was to inform them that the office of county treasurer was *vacant,* and inviting them to meet in *joint meeting* at two o'clock P. M., to make an appointment. Whilst the clerk was reading the paper, the judges left the room, and did not return again until the afternoon. When the reading was finished, a motion was made and carried to adjourn the *joint meeting* until two o'clock of the afternoon, and the *supervisors* resumed their meeting as a *separate* board, and *nominated* Robertson Whiteside as treasurer. At about two o'clock P. M., *three* of the judges and the supervisors went into *joint meeting,* and

proceeded to complete the appointment of *superintendents of the poor*, which had been left unfinished in the forenoon. When the superintendents were appointed, one of the supervisors made a motion that the meeting proceed to the appointment of county treasurer; which motion was put and carried, and thereupon the supervisor, who had been appointed chairman of the joint meeting in the morning, announced *Robertson Whiteside* as the person nominated by the *supervisors* for the office, and inquired of the *judges*, whether they had made a nomination. One of the judges answered that *they had not*, and *that they would have nothing to do with the appointment of county treasurer.* The ballot was then taken, and resulted in a large majority for Robertson Whiteside, and he was thereupon declared to be duly appointed. As soon as the balloting commenced, *the judges left the room*, and did not return. The judges were called upon to vote, but did not answer to the call, or vote. On the first day of the meeting of the supervisors and of the judges, the judges in their room *resolved*, not to remove the county treasurer, and to take no part in any proceedings for that purpose, and the supervisors were repeatedly apprised of their determination. On the facts thus found, judgment of *ouster* was rendered by the supreme court. See the opinion delivered by the Chief Justice, 23 *Wendell*, 9, *et seq.* The defendant sued out a writ of error, removing the record into this court, where the case was argued by:

*A. Taber*, for the plaintiff in error.

*S. Stevens* and *Willis Hall*, (Attorney-General,) for the defendants in error.

*Points submitted and argued on the part of the plaintiff in error:*

I. *Upham*, the former treasurer, was legally removed from office. 1. He was removed at the proper time, i. e.

" at the annual meeting of the supervisors," and at the usual *place*. *Statutes of* 1836, *p.* 700, § 2, 4. 2. By the proper *tribunal*—the judges and supervisors in " joint ballot." If this section meant a majority of the judges, and also a majority of the supervisors, giving to each body a veto power, the *joint ballot* would be *senseless and inappropriate*. 3. The act requires for a removal either, 1st, a majority of those who (all having the opportunity) choose to attend and vote; or, at most, 2d, a number of votes equal to more than half the joint meeting when full. In either view, the number (" present and voting") for the removal was sufficient. 4. The act designating the time and place for such a removal, requires no other notice. But if it did, due *notice was given*, and no *want* of it is set up or pretended in the return. 5. The joint meeting being *duly organized*, the judges were mere *individual members*. Their presence, absence, or protest afterwards, was immaterial. *Oldknow* v. *Wainwright*, 1 *Wm. Blackstone's, Rep.* 229; *S. C.* 2, *Burrows' Rep.* 1017. 6. A statute authority for a public purpose may always be exercised by a majority of those on whom it is conferred, unless the act directs otherwise. *Rex* v. *Windham, Cowper's Rep.* 377, 7 *Cowen's Rep.* 530, *note A.*

II. The opinion of the supreme court to the contrary of the last point, it is submitted, is erroneous. 1. In relying upon English adjudications as to the acts of a municipal corporation aggregate, after being deserted by the mayor, its presiding officer; which are 1st, not analogous; 2d, an unauthorized innovation upon the common law, as declared up to the time of our revolution. *King* v. *Norris*, 1 *Barnardiston's Rep.* 385. *Case of Wadham College, Cowper's Rep.* 377. This innovation has never been adopted, but rather repudiated in this country. *Case of St. Mary's church*, 7 *Serg. & Rawle's Rep.* 517. *Angel & Ames on corporations*, 286-7. 2. In construing an act authorizing a removal by " joint ballot," as if requiring it to be done by *concurrent resolution*. That the legislature understand

the effect of a joint ballot differently, *see statutes of* 1837, *p.* 504, *chap.* 439.

III. The plaintiff in error was duly appointed. 1. A vacancy had happened in the office of county treasurer by removal. *Statutes* 1836, *p.* 700, § 1. 2. The supervisors had nominated him as their candidate. 1 *Rev. Stat.* 109, § 29, *sub.* 2. 3. The judges in their " separate chamber," had " failed or refused" to nominate, and the meeting " immediately proceeded to elect" the relator by " joint ballot." *Session Laws of* 1837, *p.* 504, *chap.* 439. 10 *Wendell's Rep.* 612. 4. This appointment was properly made on the *second* day of the meeting of the supervisors. The appointing power was assembled, and the statute, 1 *Rev. Stat.* § 29, *sub.* 1, is at most, only *directory* as to the time. *Rex* v. *Sparrow*, 2 *Strange's Rep.* 1123. *Rex* v. *Liecester*, 7. *Barn. & Cress.* 412. *People* v. *Allen*, 6 *Wendell's Rep.* 486. *Dwarris on Statutes*, 714.

*Points submitted and argued on the part of the defendants in error:*

I. The relator lawfully held the office of treasurer of Chautauque county on 1st November, 1838, and has not since been legally removed. *Statutes of* 1836, *ch.* 459, § 2. *Rex* v. *Bellinger*, 4 *Term R.* 810; *Rex* v. *Miller*, 6 *Id.* 268. *Rex* v. *Bower*, 1 *Barn. & Cres.* 492. *Rex* v. *Miller*, 4 *East.* 17. *Mackel* v. *Nevison*, 11 *East.* 85, 87, note. *Viner's Abr., tit. Corporation*, (*G. III.*) *Kyd on Corporations* 36. *Rex* v. *Passmore*, 3 *Term R.* 199.

II. If the above position be correct, it necessarily follows that the relator is still treasurer, and that the defendant could not have been legally appointed to the office of treasurer. The people are entitled to judgment of ouster against the defendant, and restoration of the relator.

III. But if the relator was legally removed, the defendant has not been legally appointed, and therefore the exercise of the duties of the office by him is a usurpation. *Statutes of* 1836, *ch.* 459, § 1. 1 *R. S.* 109, § 29. *Rex*

1841.

Whiteside
*v.*
The People.

v. *Miller*, 4 *East.* 17.   *Comyn's Dig.*, *tit. Franchise*, (*F.* 21.)   6 *Term R.* 268, 280.   *Rex* v. *Buller*, 8 *East.* 389. *Rex* v. *Williams*, 2 *Maule & Sel.* 141.

After advisement, the following opinions were delivered:

By *Senator* DICKINSON.   Two questions are presented in this case: 1st. Was the relator legally removed from the office of treasurer of the county of Chautauque ? and 2d. Was the plaintiff in error duly appointed to that office ?

County treasurers now are, and ever have been, with the exception of the four years from 1836 to 1840, appointed by the boards of supervisors alone, and removable at their pleasure.   During those four years the judges of the courts of common pleas were by law associated with the supervisors, in the appointment and removal of county treasurers.   The alleged removal of the relator from office, took place in the fall of 1838, when the new law had been in operation between seventeen and eighteen months. Now, unless the relator had been appointed to office during that time, he must have been appointed by the supervisors alone, and was consequently liable to be removed by them alone, the statute declaring that he " held during the pleasure of the board appointing him."   1 *R. S.* 114, § 13. If the new law could have taken effect at all upon the treasurers in office, at the time it was enacted, the most it could do was to give to the judges a concurrent jurisdiction with the supervisors in the *removal* of those officers.   The old law was not repealed, except so far as the new one was inconsistent with it.   Authorizing a new board to make removals does not of itself revoke or annul the authority of the old; they may be concurrent and both stand.   Parallel lines do not interfere.   There is nothing in the case which shews when or by whom Upham was appointed. He was in office on the second Tuesday of November, 1838. If he had been appointed within seventeen or eighteen months, it must have been by the new joint board, and in

that case he was subject to be removed only by the same board. If he was appointed at any time before, the supervisors were competent, without the judges, to remove him. The vote for that purpose was nineteen to three, and it has not been pretended that his removal was not regular, if the supervisors had the power to do the act alone. It follows that the removal *may* have been regular, though the judges had not participated, or even had an opportunity to participate in the act, for it no where appears that they had a right to do so. This view of the subject is, to my mind, conclusive, and entitled the defendant below to judgment.

I will, however, take another view of the case, and assume that Upham had been appointed to office under the new law. If thus appointed, it follows that he must have been removed under the same law, or his removal was not valid; and whether valid or not, depends upon the proper construction of that law. The words of the act are, " the county treasurer may be removed from office by the *joint ballot* of the judges of the county courts and board of supervisors of the respective counties of this state, at the annual meeting of the said supervisors: a majority of the said judges and supervisors present and voting shall be necessary to make a removal of such treasurer. *Statutes of 1836, p. 700. 3 R. S. 367, § 2.* The removal is to be by *joint ballot,* and not by *concurrent resolution.* These things are essentially different: the first is the act of a *single body* formed from two bodies convened together, and when convened forming but one body. It is an essential ingredient of a joint meeting, that when convened the bodies out of which it is formed, whether two or more, are merged and become one. Another ingredient is, that every individual composing it stands upon an equal footing with every other individual, and the presence of one individual is not more essential than that of another. It is only necessary that a *quorum* should be present, and what number shall constitute a quorum depends upon the law or

ordinance requiring the meeting, or upon some by-law of its own. On the other hand, a *concurrent resolution* requires the separate act of two or more distinct and independent bodies, each of which must have a quorum of its own, and each has a veto upon the other. The law in question requires a *joint ballot*. It does not contemplate the separate action of either the judges or supervisors; any such action, therefore, as resolving what they will, or what they will not do, when they come to be convened in joint meeting, is altogether futile and nugatory. The supreme court, in their exposition of this statute, say that the removal " must be at the pleasure of both bodies." With great deference I must say, this is *making* rather than *expounding* law. The law says that the removal may be made by *joint ballot;* the supreme court say that it cannot be done, except by concurrent resolution or the *pleasure of both bodies.* This is not only at war with the terms and spirit of the act, but it would utterly defeat its object: which was to throw an additional weight of power into the hands of the judges in those counties where the boards of supervisors were nearly balanced, and thus enable the judges to make appointments at variance with the wishes of a majority of the supervisors. If, as the supreme court say, both bodies must concur, before a removal can be made, the effect would be to retain in office the political friends of a majority of the supervisors, and thus the law would be made ineffectual. When the supervisors of Monroe attempted to put this construction upon a similar provision of law, they were promptly overruled. The supreme court told them (10 *Wendell* 612,) that their conduct was fraudulent; that they conspired to violate a duty which they had sworn to perform; that a refusal to meet according to law was an indictable offence; that a *refusal* to nominate was equivalent to a nomination in fact, and that they could not thus violate their duty and be screened from punishment, nor should they thus defeat the objects of the law.

The case at bar presents to the eye of the same supreme court, a very different picture. It is curious to observe how acts so marvellously alike, can spring from motives so entirely different. In this case, the judges were not indictable for refusing to meet, and it was entirely right for them to *refuse* to nominate, and to leave the room precipitately as often as they were called upon to act. The court say, " It cannot be said that the judges acted improperly." In another place they say, " The motives of the respective bodies, we do not inquire into." He who will take the trouble to read the two cases cannot fail to see that what is *fish* for the county judges, is *fowl* for the supervisors. The *quorum* required by the statute for removals, is a majority of a full board. A full board in this case, consisted of 28 members; all were present when the motion was made, and 23 remained and voted, 19 of whom were for the removal.

The supreme court seem to think that their construction is supported by certain English adjudications founded upon charters of petty corporations, in which the loyal subjects of the British crown discover a government within a government; and amuse themselves by drawing analogies between their constitution and that of their own boasted empire. In the mayor, they think they see their sovereign, in the aldermen the house of lords, and in the commonalty the house of commons, and they are pleased to think that as a valid law requires the concurrence of the crown and both houses of parliament, so these branches of the little empire must all be present and act, or else these doings are void: I do not object to such fancies. Let those who please, indulge themselves in that way; but with all due respect to the supreme court, it seems to me to require a more active imagination to discover an analogy between the joint meeting in question, and those English corporations, than it did to find a similarity between the latter and the English government. If it were necessary to cross the Atlantic for assistance to construe this statute, much more

1841.

Whiteside
*v.*
The People.

1841.

Whiteside
*v.*
The People.

pertinent and rational cases could have been found. An English statute forbade the warden of a college to affix the corporate seal in any case without the consent of *him-self* and a majority of the fellows of the college. The warden thought he had the negative in his own hands, but the king's bench held that he made but one when acting with the fellows, and compelled him to affix the seal contrary " to his vote and consent." *Cowper* 377. In *The King* v. *Brower*, 1 *Barn. & Cres.* 492, it was ruled that in a *joint meeting* each member has a single vote only, and that a mayor's vote was no better than that of an alderman, and that the less numerous body has no veto upon the acts of the more numerous. In *The King* v. *Norris*, 1 *Barnard. K. B.* 385, the charter made it necessary for the *mayor* to be present at all corporate meetings. At a certain meeting the mayor presided till the names of certain persons were presented to be admitted as freemen, when he declared the meeting dissolved, and left the chair; but the meeting, notwithstanding, proceeded to admit the persons proposed. The court declared the admission good, and though they said no *new* business could be proposed in the absence of the mayor, yet the meeting had always the right to proceed in the business begun when he was present.

I do not deem it necessary to look farther for foreign authority. The terms of the law under which this removal was made, appear to me too plain to be misconstrued by an unbiassed mind. The law itself is now wiped from the statute book. During its short existence, I am not aware that it was the subject of judicial investigation except in the case under review. Proceedings by bodies very similarly constituted, have often been examined by our courts, and it will be found that the positions above taken have been uniformly sustained, as often as they have been presented, down to the present case. In addition to the case above quoted, 10 *Wendell*, 612, I shall cite but one more, viz: *ex parte Rogers*, 7 *Cowen* 526. That was an application for a mandate to compel the canal commis-

sioners to pay to the relators a sum of money assessed by the appraisers, for damages sustained by them in the construction of the Champlain canal. The question was, whether the damages had been legally assessed. The law under which the assessment was made constituted a board by associating one canal commissioner with the two appraisers appointed by the governor and senate, *Statutes of* 1825 *p.* 398, without any provision, that the determination of a *majority* should be good. The facts in the case were these : Canal Commissioner *Young* met with the two appraisers at Fort Edward in December, 1825, and heard the proofs and allegations of the parties, but they separated without deciding upon the claim. On the 24th March, 1827, fifteen months afterwards, the same persons were again convened in the city of Albany, when the two appraisers decided that they would then proceed to settle the claim; but Commissioner *Young* dissented, refusing to act, and declaring himself absent ; and not a member of the board. The two appraisers, notwithstanding, proceeded and made an assessment. It was insisted, in that case, that the canal commissioner was an *integral* part of the board, and that the assessment was void because he did not participate in it. But the court held the assessment good; thus virtually holding that the commissioner, being present when the subject was introduced, and having an opportunity to participate, his refusal to do so ought not to vitiate the proceedings. What microscopic eye can, in principle, distinguish that case from this ? In this case, after the joint meeting was formed, the business was introduced, and the judges refused to act, and left the room. In that case the canal commissioner refused to act, and declared himself absent.

The course of proceedings of this court, is another illustration of the same rule of construction. The court is formed of four *integral* parts, to wit: the president of the senate, the senators, chancellor, and the justices of the supreme court, or a major part of them, yet when conven-

ed they are a unit, and no one is deemed a more important member *than another*, except as to the difference arising from talent and learning. On the question of a *quorum*, and on all other questions, numerical force is always the test. No one of these integral or component parts, attempts to limit or control the action of the body. The justices of the supreme court never rise in their places and say that they are satisfied with this or that judgment or decree, and that they decline sitting in the court for the purpose of reviewing it; nor would they expect to interrupt the proceedings of the court, if they should protest and withdraw, leaving behind a sufficient number constituting a quorum. If there be such a conservative principle in the constitution of this court, it has lain dormant for a long time. But now that it is discovered, I hope it will be turned to good account, and if the time should come when a majority of this court should be disposed to dismiss all or any of its present tried and faithful officers, without adequate cause, (I hope the hypothesis is not disrespectful,) I pray his honor the chief justice, to interpose and inform the court, that he and his brethren have had the matter under consideration, and had resolved in their own chamber, before coming into court, that it was inexpedient to make any removals; that they would take no part in the matter, and then withdraw with his associates, and thus save to the state the future services of our present worthy and accomplished officers? But I fear for them, that no such latent virtue can be found in the constitution of this court; and if not, then I am unable to see where the analogy fails, and why the claims of the relator to the office of treasurer of the county of Chautauque, must not fall to the ground. The affirmative of the first question, therefore, seems to me to be fully established, and that the relator was legally removed from office.

The second question is, whether *Whiteside* was duly appointed. It is objected that the appointment was not made at the proper time, the law requiring nominations to

be made on the *first day* of the meeting of the board of supervisors; this nomination not having been made until the second day. The case of *The People* v. *Allen*, 6 *Wendell*, 486, shews that the time in which a statute directs a public act to be done is *directory* only, and that the act is good though done afterwards. The other objection is, that there was no nomination on the part of the judges. The answer to which is, there was a *refusal* to make a nomination, and that is equivalent to a nomination in fact, 10 *Wendell*, 612. *Statutes of* 1837, *p.* 504. This question, therefore, I think is also clearly settled in the affirmative.

The result of the examination which I have been able to give this cause is, that the judgment of the supreme court ought to be *reversed.*

*Senator* SKINNER said that he understood the learned senator, who had just sat down, to advance the doctrine that the law of 1836, associating the judges of county courts with the supervisors in the appointment of county treasurers, should be intended to apply only to such persons as should be appointed county treasurers subsequent to the passage of that act, and that it could not affect those then in office, and consequently that the supervisors, *alone*, had the power to *remove* a county treasurer appointed previous to the passage of the act. He said he dissented entirely from the views and arguments presented by the learned senator. In his judgment, the act of 1836 applied to all cases of appointment and removal of county treasurers, whether appointed prior or subsequent to the passage of the act; and that the supervisors, *alone*, had no power or authority, by the provisions of that act, either to remove or appoint a county treasurer in any case whatever.

·He said that he agreed that the single, simple question presented by this case was, whether by the act of 1836, the board of supervisors, *alone*, without the co-operation and concurrence of the judges of the county courts, had

1841.

Whiteside
*v.*
The People.

the *power*, or were competent to make a removal of a county treasurer. If *not*, then *Upham* was not removed, and consequently there was no vacancy, nor a valid appointment. The act of 1836, which was in full force at the time of the pretended removal of Upham, provides that the county treasurer may be removed by the *joint ballot* of the judges of the county courts, and the board of supervisors, at the annual meeting of the latter; and that a *majority* of *both bodies*, *present* and *voting*, shall be necessary to do the act. If otherwise, the law would be a perfect nullity. The judges of county courts, and the board of supervisors, are separate and distinct tribunals; and so far as the removal or appointment of county treasurers was concerned, they had equal power and jurisdiction; neither could perform the act alone, nor could it be performed by one without the presence, co-operation and concurrence of the other. By the act they were associated together in the appointment of commissioners of deeds, superintendents of the poor, and county treasurers. They were required to meet, at a certain specified time, as separate and distinct bodies, in separate rooms, and make out *separate nominations;* after which they came together and compared nominations, and in case of disagreement or nonconcurrence, the appointments were made by *joint ballot* of the two bodies, and in no other way; a *majority* of *both*, *present* and *voting*, being necessary to make a valid appointment. In the present case, it was not pretended that Upham was removed by the *joint ballot*, the co-operation or consent, in any manner, of both the judges and supervisors. On the contrary, it appears that the *judges* resolved *not to remove* the incumbent. The supervisors, it is true, resolved that he *should be removed*, at all events. Both parties were equally obstinate—equally determined—equally tenacious of their rights and prerogatives, and neither would yield. In relation to the policy or wisdom of the law under which they acted, or the relative merits or demerits of the parties concerned, this court, he said, was not

now called upon to decide. However unnecessary, un-
wise, or impolitic the law in question may have been;
or however reprehensible the conduct of the judges
on this occasion, it matters not in the decision of this
case. It is sufficient that the law was not complied with.
The judges refused to act; no *joint ballot* was had; no
*removal* could be legally made; no *vacancy* existed; and
consequently no *appointment* could be valid. For these
reasons, he said he was clearly of the opinion, that Robert-
son Whiteside never had any legal claim or right to the
office of county treasurer; that the supreme court were
right in their decision, and that their judgment should be
*affirmed.*

The CHANCELLOR, it is understood, declined to deliver
an opinion in this case, on the ground of one of the judges
of the county court being his brother.

On the question being put, *Shall this judgment be re-
versed?* The members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, and
*Senators* DICKINSON, FURMAN, HAWKINS, HOPKINS, HULL,
HUMPHREY, HUNT, LEE, H. A. LIVINGSTON, PECK, PLATT,
RHOADES, and WORKS—14.

*In the negative:* Senators CLARK, DENNISTON, ELY,
HUNTER, JOHNSON, PAIGE, SCOTT, SKINNER, and STRONG
—9.

Whereupon the judgment of the supreme court was
REVERSED.