PEOPLE *ex rel.* CHURCHYARD *v.* BOARD OF COUNCILMEN OF CITY OF BUFFALO.

PEOPLE *ex rel.* ILLIG *v.* SAME.

(*Superior Court of Buffalo, General Term.* August 3, 1892.)

CITY ORDINANCE—VETO POWER OF MAYOR—AMENDMENT OF CHARTER.
　　Under Act April 27, 1892, (Laws 1892, c. 379,) amending the charter of the city of Buffalo so as to provide that "commissioners of police shall receive such annual salary as may be fixed by the common council at a joint session thereof," and that "said common council shall immediately * * * determine the amount of such salary," the mayor cannot veto a resolution so fixing the same, notwithstanding that Act March 27, 1891, (the revised charter of said city,) provides (section 18) that "every ordinance and resolution of the common council," with immaterial exceptions, "shall be presented to the mayor before it shall be of force," and that, if he does not approve it, but returns it with his objections to the board of aldermen, that board and the board of councilmen shall pass it by the votes of two thirds of all the members elected before it shall be of force. TITUS, C. J., dissenting.

Appeal from special term.

*Mandamus* on the relation of William K. Churchyard against the board of councilmen of the city of Buffalo to compel respondent to approve certain warrants drawn in favor of relator and Fred J. Illig in payment of their salaries as police commissioners of said city, and also on the relation of Fred J. Illig for the same purpose. From orders directing the issuance of peremptory writs, respondent appeals. Affirmed.

Argued before TITUS, C. J., and HATCH, J.

*Philip A. Laing,* for appellant.　*Frank C. Laughlin,* for respondent.

HATCH, J. The relator is one of the police commissioners of the city of Buffalo. His salary was fixed under and in pursuance of chapter 379, Laws 1892, adopted by the legislature and approved by the governor of the state April 27, 1892. This act provides that "the commissioners of police shall receive such annual salary as may be fixed by the common council at a joint session thereof, and the said common council shall immediately upon the passage of this act determine the amount of such salary." This act is an amendment of section 184, Laws 1891, approved by the governor March 27, 1891,

commonly known as "The Revised Charter of the City of Buffalo." The council met in joint session, and determined that the salaries of the commissioners be fixed at the rate of $3,000 per annum, beginning May 6, 1892, the date of the joint session. After its action said determination was presented to the mayor of the city for his approval, and was by him returned to the board of aldermen without approval, accompanied by a veto message, reciting his objections thereto. The board of aldermen declined to take action thereon, and adopted a resolution directing that a warrant for the payment of relator's salary be drawn in accordance with the determination of the joint session. When this action was reported to defendant it adopted a resolution disapproving of said action, and refused assent to the warrants so drawn. This refusal led to the making of the order appealed from. By stipulation the questions presented by this appeal are limited to three. The opinion delivered by the learned judge at special term, to my mind, satisfactorily answers all the objections raised, and ordinarily further discussion would be deemed unnecessary, but, as one question is pertinaciously and confidently argued on this appeal, a further discussion of it is not deemed out of place. It is formulated in these words: "That the action of the joint session of the common council in fixing the salaries in question was subject to the veto power of the mayor." In disposing of this question a consideration of the veto power, its history, purpose, and growth, may aid us in arriving at a correct solution. The word "veto" is of Latin extraction, and, literally translated, reads, "I forbid," or "I deny." These words have a singularly ominous sound when they are applied in a democratic government, and at once call attention to the fact, and challenge the authority. There are, in constitutional governments, two fundamental theories upon which the grant of the power of veto rests: *First*, to preserve the integrity of that branch of government in which the vetoing power is vested, and thus maintain an equilibrium of governmental powers; *second*, to act as a check upon corrupt or hasty and ill-considered legislation. These theories have entered into all debates touching the power. The right, when given at all, is usually lodged in the executive branch of government. Rome vested it in the tribunes, and the salutation "I forbid," pronounced by a tribune, stationed at the door of the Roman senate, meeting a bill, nullified it. The crown, in England, possesses the same power. French philosophers exhausted their learning and ingenuity upon the constitution of 1791, and saw it fall apart for the reason, among others, that the king possessed the power of suspension of legislation, unless adopted by three successive assemblies. The Spanish king might twice refuse his sanction to the action of the cortes before it could find a place in the law, under the constitution of 1812; and the Norwegian constitution of 1814 was like it in this respect. The early colonial legislatures felt the same power both from crown and governor, for it was the practice of the latter to have money orders in his favor injected into or accompanying bills to be signed, so that he might receive the former at the time or before he signed the latter, which accompaniment was much preferred; while the grievance against the crown found expression in the declaration: "He has refused his assent to laws the most wholesome and necessary for the public good." It was thought by Blackstone that this absolute power of veto was needful for equilibrium, and so he wrote: "Here, then, is lodged the sovereignty of the British constitution, and lodged as beneficially as is possible for society; for in no other shape could we be so certain of finding the three great qualities of government so well and so happily united. If the supreme power were lodged in any one of the three branches separately, we must be exposed to the inconveniences of either absolute monarchy, aristocracy, or democracy, and so want two of the three principal ingredients of good polity,—either virtue, wisdom, or power. If it were lodged in any two of the branches,—for instance, in the king and house

of lords,—our laws might be providently made and well executed, but they might not always have the good of the people in view; if lodged in the king and commons, we should want that circumspection and mediatory caution which the wisdom of the peers is to afford; if the supreme rights of legislature were lodged in the two houses only, and the king had no negative upon their proceedings, they might be tempted to encroach upon the royal prerogative, or perhaps to abolish the kingly office, and thereby weaken (if not totally destroy) the strength of the executive power. But the constitutional government of this island is so admirably tempered and compounded that nothing can endanger or hurt it but destroying the equilibrium of power between one branch of the legislature and the rest." Bl. Comm. (Chase,) 17. It is to be noticed in this connection that the British constitution makes the crown a constituent part of the legislature which does not find place in this government. The truth of the statement that one generation has not foresight sufficient to legislate for the next finds vivid confirmation from this quotation, for it remains as the fact that since 1692 the right of veto by the crown has not been exercised, and it is asserted by some writers that its exercise at this day would lead to a revolution. The veto power was regarded with great distrust and disfavor by the framers of our government, both state and national, and its right of exercise is by no means universal now. Only one of the original state constitutions—Massachusetts—gave even a qualified veto, while the articles of confederation withheld it entirely, reaching the other extreme of requiring the assent of nine states to important acts of legislation; thus giving to a minority of five states an absolute right of veto. The happy solution of this question by the framers of the federal constitution had for its basis the integrity of the executive branch of the government, and very little consideration was given to the theory of a check upon ill-considered and hasty legislation. As late as 1884, and, so far as I possess information, at this date, Delaware, North Carolina, Ohio, and Rhode Island still withhold the veto power from the executive; while in eight others a majority vote of the whole number of members elected to the legislature constitutes all that is required to override a veto. By the constitution of 1871 the German empire vests its legislative power in the federal council and the imperial diet. No mention is made of the emperor, but in certain specified bills concerning the army, taxes, etc., the proposal of the federal council only is accepted, and this gives to the emperor, as king of Prussia, the right of veto against its action. The Swiss federal constitution gives the president no veto power, but in certain cantons the right rests with the voters. In the kingdom of Poland the objection of a single deputy was sufficient to nullify the bill.

This history, and these illustrations, serve to show that the people of all constitutional governments are extremely solicitous and jealous of this power, and have at all times hedged it about by carefully expressed limitations. Consequently it follows that the right of its exercise by an executive must always be supported by plain and undoubted authority. It has of recent date been the gradual and growing belief that this power is wisely placed in the executive head of municipal authority, not as essential to preserve an equilibrium of governmental power, but for almost the sole purpose of a check upon corrupt and hasty action and ill-considered legislation. This is not a new idea, but it was not accepted until experience has shown it to be, usually, for the best interests of the people in the government of cities. Franklin long ago stated one reason for the lodgment of this power in an executive. "A single man may be afraid or ashamed of doing injustice; a body is never either one or the other, if it is strong enough. It cannot apprehend assassination, and, by dividing the shame among them, it is so little a piece that no one minds it." While, for these and other reasons, it is doubtless the tendency of modern legislation to bestow this power upon the executive head of municipal

government with much liberality, yet it is equally true, and always to be borne in mind, that the power must be express or necessarily implied, and without it, it does not exist. Dill. Mun. Corp., (4th Ed.) §§ 208–331; *Martindale* v. *Palmer*, 52 Ind. 413; *National Bank* v. *Town of Grenada*, 41 Fed. Rep. 91; *MacKenzie* v. *Wooley*, 39 La. Ann. 949, 3 South. Rep. 128.

This brings us to an examination of the statute under which the power here exercised is claimed to exist. The charter of Buffalo is an entire scheme for the government of this city. It was carefully digested, and its authors conceived and carried out, so far as they possessed the ability, a complete and connected scheme. The legislative power is vested in a common council, consisting of two branches. The mayor is not a constituent part of such legislature. In nearly all matters this council acts as separate bodies. They act jointly in certain specified cases. Before the amendment which is the subject of examination here, there were two cases which called for joint sessions,—one for the election of a city clerk, (section 33,) the other to fill vacancies in certain elective offices, (section 374;) but in neither case had the mayor any control over its action; the action was final. So far as the present amendment is concerned, there is nothing expressed therein which gives the power of veto to the mayor in terms. It must therefore rest, if at all, in implication. It seems quite clear that the scheme contemplated by this charter was that original action should be taken by the board of aldermen, and then be passed upon by the board of councilmen, which action was to be subject to review by the mayor, and the scheme therefore provides for this, and nothing more. Where acts are passed upon by the mayor following this course, definite and precise provisions provide to whom such action shall go, and, if adverse to the council's action, how the objection shall be specified, and what action they shall proceed to take, and what vote is essential to override the veto. It is conceded that there is no provision of law which in terms provides for a review of a joint action. But two claims are urged by appellant in answer to this defect: *First.* That the amendment is to be treated as an original act, and must be construed in view of the original statute; that as the amendment does not in terms take away the right of veto, and as it existed before the mayor had such right, therefore he possesses it now. *Second.* That even though there be no specific provision for the review of the veto, yet the power is not for that reason taken away. I am of opinion that the first view is not tenable; that it places a much too limited significance upon the word "determine." This amendment is mandatory. It reads, "shall immediately determine the amount of such salary." They could be compelled by *mandamus* to assemble and act, and no provision is made, so far as I can find, for a review. On the contrary, I think the construction must be that it is alone the determination of the joint session which is contemplated and commanded; that as the charter provides, as we have seen, for a review of separate action, and none for a joint action before this amendment; that when the amendment was made the legislature contemplated a change of the system in fixing these salaries so as to conform to the theory of joint sessions as then existing in the charter, and, as no provision was made or contemplated for a review of joint action, and as the amendment does not provide for it, therefore it does not exist. Under the conditions here adverted to I think the correct construction to be that "when a general intention is expressed, and also a particular intention incompatible with the general intention, the particular intention is to be considered in the nature of an exception," (*Hoey* v. *Gilroy*, 129 N. Y. 138, 29 N. E. Rep. 85; *Bork* v. *City of Buffalo*, 127 N. Y. 64, 27 N. E. Rep. 355;) and that such rule is to be applied here. These salaries can be fixed without the affirmative vote of a single councilman. *Whiteside* v. *People*, 26 Wend. 634; Cush. Parl. Law, §§ 412–414. If the construction contended for is to obtain, it

would not be possible with a veto to work such a result.   I am also of opinion that the second objection is equally unsound, for if there be still left the power of veto, and no power of review, it follows that the veto is absolute, and the action is nullified.   This result carries us far beyond any veto power granted by the charter to the mayor upon any act of the council, for at the most he has only a suspensory power, which may be overridden.   If now we say that the power is imposed by reason of a prior grant of it, we find ourselves confronted with the condition that, while the actual grant is limited, the implied power is absolute.   It is needless to add that such implication ought never to be reached by any proper construction of power.   I am therefore led to the conclusion that the mayor possessed no power of veto of this action, and that the order appealed from must be affirmed, with costs.

Like order in the case of Illig.

. TITUS, C. J., (*dissenting.*)   The questions here raised are brought before this court by an appeal from an order of the special term granting a peremptory writ of *mandamus,* directed to the board of councilmen of the city of Buffalo, requiring said board to approve of a certain resolution adopted by the board of aldermen on the 23d day of May, 1892, directing warrants drawn in favor of the relator and Frank J. Illig for their services as police commissioners of this city, at the rate of $3,000 per annum.   By chapter 105 of the Laws of 1891 the legislature enacted a new charter for this city.   It became a law on the 27th day of March, 1891.   The provisions making a general change in the city government did not take effect until the first Monday of January, 1892, but titles 7 and 8 of the act took effect and became operative at once.   These titles, relating to the department of police, are substantially a re-enactment of chapter 634 of the Laws of 1880, as amended by chapter 359 of the Laws of 1883, establishing a police department for this city.   The salary of the police commissioners was fixed by section 36 of the act of 1880, as amended by section 8 of the Laws of 1883, at $1,500 a year, and was the salary they were entitled to receive at the time the present charter went into effect.   No sum was named which they should receive under the new charter, but section 474 provides that all appointive officers having a fixed and limited term of service, and holding office when this act takes effect, shall, during the terms for which they were appointed, receive the salary they were entitled to receive when the charter takes effect; so that the police commissioners were entitled to receive $1,500 a year as their lawful salary, because that was the amount they were receiving at the time the act took effect.   By section 184 of the charter it is provided that the commissioners of police shall receive such annual salary as may be fixed by the common council by ordinance.   It was evidently intended to make provision for fixing salaries by the city when by expiration of the term of office of the present commissioners such action would become necessary, as the provision of *section 474,* fixing salaries, is a temporary one.   By section 17 it is provided that no change shall be made in the salary or compensation of any officer or employe during his term of service.   This provision is found in the section conferring power upon the common council to enact ordinances, so it would seem from the plain reading of the charter that the police commissioners were to receive $1,500 a year salary, and no more; that the common council had the power by ordinance to fix the salary of the commissioners whenever the terms of the present commissioners should expire, but could not change the salary of the present commissioners, either to increase or diminish, and consequently was limited to the amount they were receiving at the time the charter took effect.   It appears that the common council, by ordinance, passed and approved by the mayor on the 8th day of February, 1892, as provided by section 184 of the charter, fixed the salary of the police commissioners at $1,500

a year. This was the situation when, on April 27, 1892, the legislature passed an act amending section 184 of the charter so as to read as follows: "The commissioners of police shall receive such salary as may be fixed by the common counsel *at a joint session thereof, and the said common council shall, immediately upon the passage of this act, determine the amount of such salary.*" The amendment is indicated by italics, and consists in the addition of that clause to the section. Before the amendment the common council were empowered to fix the salary of the police commissioners by ordinance. The amendment still left it with the common council to fix the salary, but it was to meet in joint session at once, and do what it was already authorized to do by the board of councilmen and the board of aldermen acting separately. The amendment does not in terms authorize the common council to increase the salary of the police commissioners, and makes no change in the section other than to authorize the common council to act in joint session, instead of in the usual way by separate action of the board of councilmen and the board of aldermen. It may well be questioned whether the amendment conferred any additional power upon the common council, and whether it was not intended simply to change the mode of the exercise of the power which that body already possessed, in view of the express prohibition contained in section 17 of the charter, and in the absence of express authority in the amendment. However that may be, I do not think it necessary to pass upon that question. The view which I have taken of the case leads me to the conclusion that the ordinance or resolution passed by the joint session, fixing the salary at $3,000 a year, is of no force without the approval of the mayor, and that the amendment did not have the effect to repeal the provisions of the charter requiring such approval.

It is claimed that the legislature intended to authorize the common council to fix the salary independent of the mayor, and that it is the duty of the court to give effect to such intention. While that is true, it is clearly the law that the court cannot go outside of the act, and ask opinion of the individual members of the legislature, for the purpose of ascertaining the legislative intent. *People* v. *Potter*, 47 N. Y. 375. Such intent must be gathered from the act itself, taking into consideration what evil was sought to be remedied. It cannot be supposed that the legislature, in view of the fact that the charter represented the best sentiment of the people of this city, clearly expressed after months of deliberation by some of the most learned and patriotic of our citizens, intended to take from the mayor a power so wisely and safely bestowed upon him. The evil sought to be remedied is apparent from the charter itself. Too much power was vested in the common council and too little in the mayor. It was thought to correct supposed abuses existing under the old charter, by conferring more authority upon the executive branch of the city government; and this, in a great measure, was accomplished by the new charter. It cannot be said that the legislature, in the absence of express language, intended to undo, even in part, what had required so much labor and trouble to bring about. The legislative power of the city is vested in the common council, consisting of a board of councilmen and a board of aldermen. Section 4. But by section 18 "every ordinance and resolution of the common council, except resolutions making or approving appointments to office or place, designating the official paper, canvassing votes, adopting or altering comptroller's estimates under section seventy of this act, shall be presented to the mayor before it shall be of force. If he approves it he shall sign it, but, if not, he shall return it, with his objections, to the city clerk, who shall lay the same before the board of aldermen at its next regular meeting thereafter;" and the board shall proceed to reconsider it, and, if passed by the votes of two thirds of all the members elected, and the board of councilmen by a like vote pass it, such resolution will be of force notwithstanding the ob-

jections of the mayor.   While the mayor, independent of the statute, pos-sesses no power to veto, neither does the common council possess any power to enact ordinances and resolutions otherwise than is expressly conferred by statute or is necessarily and logically deducible therefrom.   Both derive their power from the statute, the one as much as the other; and they are limited in the exercise of such power to such acts as are by statute conferred upon them.   The common council possessed the power to fix salaries, and this amendment does not enlarge the powers of that body.   It changed the pro-cedure by which the salary of the police commissioners was fixed.   Instead of the common council acting by its two boards, one concurring in the action of the other, it requires that the power shall be exercised immediately in joint session.   The language of the amendment is clear, precise, and not ambigu-ous, and we are not called upon to ascertain what it means, but to determine what effect the last declaration of the legislature has upon the act amended. It is undoubtedly competent for the legislature to authorize the common council, either with or without the approval of the mayor, to fix the salary of the police commissioners, either in joint session or by the boards composing that body acting separately.   Has this been done by this amendment?   It has been seen that section 18 of the charter requires the approval of the mayor to the validity of a resolution of the character of the one passed by the com-mon council in joint session.   It is a well-known principle of construction of statutes that amendments must be read in connection with the whole instru-ment, and do not supersede any provision to which they are not absolutely repugnant, (*In re Gilbert El. R. Co.,* 70 N. Y. 361; *People* v. *Asten,* 6 Daly, 18, affirmed 62 N. Y. 623;) and that one statute does not affect the repeal of another, unless the two are repugnant and inconsistent, (*Hankins* v. *Mayor,* 64 N. Y. 18.)   This amendment must be construed with the charter, as a part of it, and if it is not repugnant to or inconsistent with the other provisions of that act they must stand together.   From what has been said it is not clear in what particular it is inconsistent with the other provisions of the charter, and the fact that it was passed as an amendment, and not with the original charter, does not, it seems to me, change the construction which I have given to it.   If it had been a part of the original charter, it would not have seemed absurd or inconsistent with the provision requiring the mayor to approve be-fore the action of the common council is effectual; and it is not apparent how the fact that it is an amendment changes its force or effect in that regard, or requires a different construction.   Possibly the legislature intended to do what the relator claims was accomplished by the amendment.   I do not think, however, that it can be fairly said that such a result was anticipated or intended.   If it was, then there was a failure to state that intention, either in express language or by necessary implication.   If the views here expressed are correct, it follows that the writ should not have been granted, and that the order appealed from should be reversed, with costs.

As the same question is involved in the case of People *ex rel.* Illig, now pending before us, a like order should be made in that case.

WHITE, J., did not sit.